Matter of N.D. (2025 NY Slip Op 51279(U))

[*1]

Matter of N.D.

2025 NY Slip Op 51279(U)

Decided on August 12, 2025

Supreme Court, Rockland County

Cornell, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on August 12, 2025
Supreme Court, Rockland County

In the Matter of the Application for a Subsequent Retention Order 
 Pursuant to CPL 330.20 in Relation to N.D., Defendant.

Index No. 900343/2024

Petitioner Rockland Psychiatric Center represented by
New York State Attorney General's Office
44 S Broadway
White Plains, New York 10601-4425
Phone (914 ) 422-8700
Attorneys representing Respondent N.D.
Mental Hygiene Legal Services
140 Old Orangeburg Road
Orangeburg, New York 10962
(845) 476-3670
Dutchess County District Attorney
Interested Party
236 Main St.
Poughkeepsie, New York 12601

Keith J. Cornell, J.

Before the Court is the application of Petitioner, Rockland Psychiatric Center (RPC) for a subsequent retention order pursuant to CPL 330.20 seeking to retain, Respondent, N.D. ("Respondent") for a period of two years after the expiration of the most recent retention order. RPC was represented by the New York State Attorney General's Office. The Dutchess County District Attorney's Office also appeared and participated. Respondent was represented by Mental Hygiene Legal Services. The Respondent was present throughout the proceedings. Respondent opposed the application. The Court conducted a hearing which commenced on July 14, 2025, and continued July 16, 2025.
BRIEF HISTORY
Respondent is a 57-year-old man who has mobility issues and currently walks with the aid of a walker. He was committed to the custody of the NYS Commissioner of Mental Health [*2]beginning on May 20, 1992, after having been found not responsible by reason of mental disease or defect of Arson in the Second Degree after he allegedly set fire to his family home on 8/7/1991 at the age of 23. Since that time until the present, a series of subsequent retention orders have issued in various jurisdictions, depending on the venue of his placement. Consequently, he has been under the state's care and custody for over 33 years.
On 12/02/2024 Hon. Sherri L. Eisenpress, JSC, in conjunction with RPC's application, ordered an independent psychological evaluation of Respondent to evaluate whether Respondent continues to require retention in a psychiatric hospital. Debbie Green, Ph.D. was appointed to conduct the evaluation.
HEARING
The Court had before it the following file materials, all of which have been read and considered:
1. Dr. Green's May 3, 2025 evaluation (Green Report);
2. Dr. Green's curriculum vitae;
3. RPC 10/16/2024 Hospital Forensic Committee (HFC) report;
4. Respondent's Core History consisting of 18 pages;
5. 10/21/2024 Psychiatric Evaluation prepared by Dr. Krishni M. DeThabrew, consisting of 16 pages;
6. 4/26/2012 Screening Admission Notes, consisting of 6 pages;
7. 4/19/2013 Screening Admission Notes, consisting of 7 pages;
8. Progress Notes consisting of 536 pages and covering dates from 11/14/2024- 07/07/2025;
9. 07/11/2025 Psychiatric Progress Notes consisting of 16 pages;
10. 10/9/24 CPL 330.20 Retention Application of Dr. DeThabrew;
11. 10/28/24 CPL 330.20 Application of Dr. Robin Hamilton.
In addition to the file materials, the hearing consisted of the testimony of Dr. DeThabrew on behalf of RPC and Dr. Green who was called by Respondent to testify.
As will be discussed in detail below, the facts surrounding the Respondent's original commitment and the course of his treatment and retention over these decades is not in dispute. What is the central dispute, however, is whether Respondent continues to meet the criteria for his retention at RPC's in-patient facility pursuant to CPL 330.20. There is no question that Respondent suffers from significant mental health issues, but the legal standard for the retention requires a showing that the person either 1) has a dangerous mental disorder or 2) is mentally ill as those terms are specifically defined in the statute.
RPC's CASE
EXCERPTS FROM 10/16/24 HFC REPORT
Review of Risk Factors:
1. Fire Setting- Mr. N.D. clearly has fire setting history. He presents them as being accidental and not willful or intentional and despite having a lack of insight into his Instant Offense, it is important to note that patient has not set a fire in over 20 years. He has been going out on escorted and unescorted passes multiple times a week since 2008.
2. Non-Compliance and symptom management— though Mr. N.D. had a history of non-compliance and does not know the name of his medications, he has been recently compliant with taking them without any issue. He has been engaged in some aspects of [*3]his treatment and has been attending some group sessions even though participation is limited.
3. Managing impulses and immediate gratification - Mr. N.D. spends his resources and time engaging in smoking or behaviors that will promote his ability to smoke. Although he does not use these materials to set fires, his pre-occupation with cigarettes contributes to his likelihood of engaging in other rule breaking behaviors related to money, increases his propensity of involving himself with a negative peer group (in order to get money/cigarettes) and causes him to become intrusive and harassing of peers and staff.
Ongoing efforts at smoking cessation and harm reduction are in place with his treatment team as well as attempts at engaging Mr. N.D. in more structured activities during his furloughs to mediate this risk factor.
4. Social supports- Mr. N.D. has formed friendships in the hospital and re-developed community supports through his religious affiliations. He maintains contact with his brother and an uncle via letters and phone. His sister lives in a monastery, but he has not had any recent contact with her. Both parents are deceased.
Forensic Committee Recommendation:
The Hospital Forensic Committee unanimously agrees that an application for Retention be put forth at this time to help transition Mr. N.D. safely to the community.
EXCERPTS FROM 10/9/24 DeThabrew RETENTION APPLICATION (Form BR-88)
3. Identification of risk factors related to the Instant Offense. In the days and weeks prior to the Instant Offense, what factors contributed to the dangerous act? Among many, common risk factors include non-compliance with medication, drug/alcohol abuse, fire/environmental stress, personal history of violence, Victimization, etc.
a. Mental Illness- Mr. N.D. has a history of severe mental illness dating back to early teen years and was experiencing delusions at the time of his instant offense.
b. Non-compliance with medications. Mr. N.D. has a history of medication non-compliance and had not been taking his medications prior to the instant offence.
c. Poor frustration tolerance- Mr. N.D. was upset at his parents for having to read religious books which resulted in him setting fire to his church.
d. Nicotine addiction: Mr. N.D. was smoking heavily at the time of the instant offense and used matches for his cigarettes to start the fire.
7. Other Instances of violence, patterns of violence including type(s) of weapons used.
Mr. N.D. has a history of prior arsons, in 1984 he set fire to his mattress and in May 1989, he set fire to a trash can in his residence. He also has a history of violence. In 1/90, he tried to stab his brother with a plastic knife, in March 1996 he held a staff member in head lock at Hudson River. In the past he also broke windows at his father's church and displayed threatening behavior towards his mother. Most recently in August of 2018, he threw a pen at the psychologist who was visibly pregnant at the time because he did not want to work on his relapse prevention plan.
14. Risk management: Having identified the risk factors for dangerousness (item #3), What steps have been taken to manage these risk factors? How effective have these Interventions been and what is the patient's response?
a. Mental Illness - Mr. N.D. is prescribed antipsychotic medications and a mood stabilizer. His current regimen of clozapine, Depakote and Fluoxetine has been effective [*4]in controlling his psychiatric symptoms. It should be noted that he responded well to Clozapine which he has been taking since 2007. His clozapine and Depakote levels have been within the respective therapeutic ranges.
b. History of poor compliance to treatment -Since his admission to RPC, he has been fully compliant with all prescribed medication, as well as all laboratory evaluations. He acknowledges his mental illness and states that medications have helped. He reports intent to stay in the hospital forever although he asks for unescorted furloughs sometimes. He has been known to purposely sabotage discharge planning with inappropriate behaviors and has stated that he did not want to be discharged.
c. Poor Impulse control -Mr. N.D. attends groups in the Treatment Mall to improve boundaries and appropriate social behavior, and peer interaction. He still displays poor impulse control and made inappropriate comments (asking for kisses) to a female social work intern earlier this week.
18. Current Level of Functioning (e.g.-Sleep, appetite, program participation, medication compliance, behavioral stability):
Mr. N.D. is compliant with medication and laboratory evaluations needed for his clozapine therapy. He attends his recommended therapeutic groups and participates to some degree. He has difficulty managing his personal allowance money appropriately, He can be very perseverative in making his requests known to staff. He can be intrusive and demanding usually stands by the RN station and listen to conversations and blocks staff from walking down the hallway until he makes his wants known. He lacks appropriate social conducts. He has made inappropriate sexual comments to a social work intern this week and did not see how his requests for kisses were inappropriate. He is not able to maintain a clean appearance and needs reminders to perform basic personal hygiene tasks particularly oral hygiene. He can be irritable and angry when needs are not readily met. He often reports that he is tired or "not feeling well" during activities that he does not want to engage in, however he is often standing in front of the nursing station and actively participates in activities that he enjoys often trying to seek visitors from the church to bring him food and money despite having this restricted. He does not have appetite or sleep disturbances. All urine drug screenings have been negative.
DIRECT EXAMINATION OF DR. DETHABREW
Dr. DeThabrew described Respondent as follows:
Currently he's pleasant and for the most part taking medications. He goes to groups. His participation is somewhat superficial. He will engage but not in kind of a more deep way. He likes certain groups. He like music groups and drawing groups and things like that, but not groups that actually engage him in psychoeducation and things like that. He has difficulty — he has had some cognitive deficits as the disease progressed, so his ability to engage in the treatment has also declined. However, he has these periods of irritability. He gets into kind of arguments and fights on the unit. Not fights physically but verbal arguments with other patients. In the last couple of months he's had them, as well, where they will argue about what's on the television or, you know, those kinds of little arguments, and he can become very verbally aggressive, and other patients have complained about that. So he has those kind of irritable moments, but generally he hasn't gotten in any physical fights. Also, a lot of the patients on the unit can see he is using a [*5]walker and they don't necessarily fight with him in that way. Sometimes they just laugh, and, you know, that annoys him too when he's annoyed and they are not fighting back with him, but he can become verbally aggressive with staff as well as patients.
When asked whether Respondent, if released, would pose a danger to himself or others, Dr. DeThabrew explained as follows:
I think what happens is a lot of — that he could be inadvertently cause other people to attack him because he can say nasty things. So then a lot of the patients on the unit, because they know him, they don't attack him or they don't — they just let it go, but if he was out by himself or out in the community he has to be careful with that because people will — could attack him for those reasons.
Dr. DeThabrew explained the facility's process for determining whether to provide escorted and/or unescorted furloughs for patients. In discussing the Respondent's conduct during a permitted furlough, Dr. DeThabrew testified:
Recently, most recently he got a privilege back to go to but we had to hold him back from going to church because he was begging there and he was trying to ask people for cigarettes. He was taking money or borrowing money from other patients on the unit to try and get cigarettes and that had caused problems because then he can't pay it back and then the other patients get mad and that causes problems. So one of the rules on the unit is that you are not allowed to exchange money or borrow money or give money, because that becomes, even if it's a small amount, $5, you know, there's been big, you know, kind of episodes of fights about that. So, if somebody borrows money and then they don't — can't pay, then it becomes a problem. So, he has had those kinds of issues in the, you know, years that I have been there, but most recently he's tried — we have worked with him and he said he's not going to smoke. He's not going to beg for money. So, he, you know, was asking for about more than — about a month to go for the Easter service, so, you know, we try give him some privilege so we allowed him to go this Easter which was in April. That was the last one. And then now just this past week we are trying to work with his support system in the community to see if they can come and take him at least once a month to go to court and — I am sorry, to go to church and see if he can manage his behaviors, not smoke, you know, and not do any of the things that we have talked to him about for years, a couple of years now.
Dr. DeThabrew was asked if Respondent could have successful unescorted furloughs and she responded:
No. I think that is what we are looking for. We are looking to see if he goes once a month unescorted with his church group or other group that he could demonstrate that he can, you know, refrain from smoking, refrain from begging or other dangerous things. You know, not try to run or, you know, fall, so there's a lot of risks involved with that. The other thing is if he does smoke and these symptoms come back, in the past when he had symptoms he's also had suicidal thoughts, so that poses a danger to himself. So if 40 percent of the effectiveness of Clozapine reduces, other than the fact that he could put other people in danger he has been suicidal in the past, as well. So, we would like to see him doing well on unescorted passes for a while, but for him to consistently say that he [*6]wants to be discharged and find him safe housing, supervised housing that can manage his mobility issues as well as his mental health issues, and then move forward with discharge.
The following colloquy is reproduced below:
Q Do you have an opinion as to whether he is a danger to others at the present time?
A So he can be a dangers to others if he intentionally or accidently throws his cigarettes, you know, in a careless way, or starts fires he could be a danger to himself or others. He could be a danger to starting fights because he can become very verbally aggressive when he gets angry, so in that sense he can be a danger to himself and others.
Q Within a reasonable degree of medical certainty do you believe that the patient is a risk to the safety and welfare of the community if he were released from the hospital?
A Currently without seeing whether he's going to smoke I think he will be a risk to others and maybe to himself if his levels come down and he becomes suicidal. He is also, because of the mobility, if he's in a fire it's going to be hard from him to get himself out of a place. He can't run down the stairs like he did when he was younger. He could get trapped and, you know, cause a danger to himself, as well.
Dr. DeThabrew further explained that the treatment team was prepared to begin unescorted furloughs for some period of time with the objective of evaluating the success of those furloughs and, if successful, moving in the direction of making application for a conditional release. She explained that a housing placement might be difficult.
CROSS-EXAMINATION OF DR. DETHABREW
On cross-examination the witness testified as follows:
Q You indicated that in the past he had suicidal ideation. When was that?
A When he was non-compliant with medications, multiple hospitalizations. He had suicidal ideations.
Q Dr. De Thabrew, getting back to my question, when was it? Was it before his admission in 2012 to Rockland Psychiatric Center?
A Yes.
Q And according to this progress note he has not exhibited any behavioral issues and he denies suicidal ideation and has no plan, correct?
A Currently he has not reported any suicidal thoughts while he's on his current medications.
Q And next to violence risk it states, "Patient presently not on Broset score, no behavior." What is Broset score? Is it a measure of one's level of dangerousness?
A It is a real time kind of acute measure in the sense if somebody is having — is kind of agitated right now. The nurses do this on a daily kind of basis. They would measure if somebody was irritated. Say Mr. N.D. had an episode in the day room and he was angry or irritated or fighting over the phone or the TV, then the Broset score would go up for that moment.
Q Is it a scale 0 to 10?
A No. 0 to 5.
Q And this note indicates that he's not even on the Broset score, correct?
A I don't know what they mean by that, but the nurses usually do the Broset measurement [*7]on a daily multiple times a day basis. If there is something they would say it would be zero, if there is nothing. If they have some irritability it could be 1, 2 or 3. If they have a code or they are extremely agitated or irritated it could be 5.
Q And he has not had any recent codes, correct?
A No recent code.
The testimony included the following:
Q Would you agree that to a certain extent his need for a walker now and his limited mobility makes him less of danger to other people than when he was younger?
A It depends. Physical kind of fighting, actual fighting with someone else, yes, but the ability to start a fire, no.
Q We are going to get to that. But physical violence he's less of a threat than he was when he was younger?
A Physical violence, yes, I would say because his mobility is limited.
Q And would you agree that he is at less risk of eloping from a hospital or from a supervised residence due to his limited mobility?
A I would say he is less likely to be successful at eloping from a hospital because of his mobility issues.
Q And I would like to — so turning to his cigarette use, his cravings for cigarettes has not led to any aggression; is that fair to say?
A Oh, no, it has, in the sense of where the time when he was running after the cigarette. The staff were trying to stop him, but he was, you know, running after, trying to get the cigarette. He was being aggressive.
Q Where was the cigarette?
A I think it was in the recovery center when this occurred.
Q Was somebody holding it or was it on a table or where was the cigarette?
A Somebody was having the cigarette and he was running after them.
Q Was he threatening to hurt the person or did he simply want to have a cigarette?
A He wanted to have a cigarette.
Q He hasn't attacked anybody to try to get a cigarette, correct?
A Not that I know of.
Dr. DeThabrew was asked about the hospital forensic committee's report as follows:
Q I would like to turn to the hospital forensic committee report that you mentioned.
A Okay.
Q And it's the last page of it. It's also attached to the court application.
A Is it in one of these pages or no?
Q Do to you have it?
A Hospital forensic committee, I think I have it.
MS. KEOGH: Do you have it?
THE WITNESS: I think I have it.
A Yeah, October 16th, 2024.
Q You have it, okay. So, the hospital forensic committee under review of risk factors, they list three — actually, four risk factors, correct? The first one is fire setting.
A Correct.
Q And they indicate that he clearly has fire setting history. He presents them as being accidental and not willful or intentional and despite having a lack of insight into his instant offense, but then they say it is important to note that patient has not set a fire in over 20 years. He has been going out on escort and unescorted passes multiple times a week since 2008. Correct?
A Correct.
Q And next to non-compliance and symptom management they indicate that though he had a history of non-compliance and does not know the name of his medications, he has been recently compliant with taking them without any issue, correct?
A Correct.
Q And then next to managing impulses and immediate gratification they write, "Mr. N.D. spends his resources and time engaging in smoking behaviors that will promote his ability to smoke, although he does not use these materials to set fires. His preoccupation with cigarettes contributes to his likelihood of engaging in other rule breaking behaviors; correct?
A That's what it says.
Q So it sounds like he has had access but Mr. N.D. is choosing not to set fires according to the three-panel hospital forensic committee, correct?
A I don't know what they mean. That's what it says.
Q And then next to social supports, which they list as a risk factor, they cite that he had redeveloped community supports through his religious affiliations, correct?
A Correct
Q And he's in touch with two relatives, correct?
A Yes.
Q Turning to the issue of whether he requires inpatient care, as you already testified he was grant unescorted furloughs eleven years ago, correct?
A He was given the furloughs eleven years ago, but since I have been his doctor he's not practiced them since 2022. He has — at least I can say for that time. I don't know exactly the timeframes that he's used them before. I know it's in the records. He's had it, and then he's lost it. In the sense that you can have the privilege level but if you —
Q Dr. DeThabrew, I just want to stick to my questions.
A Mm-hmm.
Q He was granted in 2014 unescorted furloughs when a Judge deemed him safe enough to have the unescorted furloughs, correct?
A Yes, in 2014.
Q And since then, I don't know if it was before you joined Rockland Psychiatric Center, he has served as an alter server at church, correct?
A Yes.
Q And he has visited museums in the community, correct?
A That's what it says.
Q And he has gone to shopping centers and parks and cafes, correct?
A Yes. I'm not sure if it's unescorted or escorted, but they do have community trips that patients take to museums, to cafe, to libraries, but usually it's with a group, but I don't know if he's gone on his own or not. I'm not sure.
Q Is it fair to say, Doctor, that if he goes to a supervised residence it is likely that he will [*8]need because of his limited mobility, he will need to go on trips from the supervised residence in groups?
A For trips, yes.
Q So he would still be supervised, correct?
A Yes.
Q And during those furloughs to the different places we just listed he never tried to hurt anybody or start any fires, correct?
A No. I would like to say like he has —
Q Dr. DeThabrew, that's what they are there for. They will ask you to follow up. But is it true that he never started any fights or started any fires while in the community?
A No, he didn't start any fights.
RE-DIRECT EXAMINATION OF DR. DETHABREW
Dr. DeThabrew's re-direct examination include the following:
Q When you were being cross-examined regarding the privileges in 2014 you were about to describe that he had the privileges but something else with regard to a level. Could you tell us what you were going to say?
A So he's had unescorted privileges. That is kind of like a — he's allowed to have them. However, if his behaviors are dangerous or are not, you know, safe for himself or the people, we could kind of curtail those privileges in the sense we don't have to let him have the unescorted privileges. So he's had them in 2008 in another facility, and since he came to Rockland in 2012 he was approved — the team thought that he was, you know, able to have them, and he — so they had made an application, and he was granted them in 2014, but since then he's multiple times demonstrated that he has not been able to be safe. So they have had to curtail his privileges in the sense not exercise them, so even though you have the privilege level, you are not exercising them because, you know, he's continues to smoke or want to smoke or go after cigarettes, try to get cigarettes, and that's been an issue since then.
The witness further testified as follows:
Q What are your concerns if a conditional release was granted before you made the determination that you were making the application for a conditional release?
A Well, first of all, he has — we have — he has no where to go, you know, according to our restraint — we have to have him go through the CPL process. We have to have him go to supervised housing. He has not been accepted to any supervised housing yet. We haven't made an application. So that takes a long time, and given his history it's going to take longer because he has to — even they want to see that he's going out on unescorted passes, that he's shown, demonstrated safe behaviors. Without that, you know, I can't imagine that any of the housing facilities are going to want to take him without that. The last records that they have showed that he's trying to get cigarettes, you know, that he's unsafe. So, it's going to be possible for us to getting him supervised housing, as is required. So, if he's not retained, I don't know what to do. We wouldn't know what to do with him.
Q With regard to the questioning on the cross-examination, if we were at a residence — if he were to leave the residence he would be going places in groups because of his [*9]mobility issues?
A It's not necessarily that he will be going in groups. For instance, he's going to go to church every month. He's — one person can come and take him, a friend or a pastor or anyone. You know, not anyone, but, you know, we would generally approve it, but he doesn't have to go in groups. He could go with a person to help him mostly, not to supervise him, to help him, you know, take the elevator or, you know, go down the step or something like that. So it could be a friend. It's not staff. It's supervised.
Q And if he were in some sort of a group home and he was going somewhere with a group, he's not necessarily supervised; is that correct?
A No, not supervised. He doesn't have to be supervised. The housing is supervised. In the house there's usually nurses or somebody who would give medication, but if he goes out he's not supervised. He's released. You know, he's discharged. He's not in a hospital anymore.
Q Thank you, Doctor. I have no further questions.
RESPONDENT'S CASE
EXCERPTS FROM GREEN REPORT
Psychiatric History at Rockland Psychiatric Center (04/26/2012- 12/26/2023): Mr. N.D. was transferred to RPC in 2012. Dr. Formica (2013) reported that Mr. N.D. continued to exhibit symptoms of a thought disorder, appeared delusional, paranoid, and at times grandiose (e.g., regarding money and inheritance). His affect typically appeared appropriate and flat; however, Dr. Formica noted that he could not "delay gratification and gets easily frustrated, and during those times becomes verbally abusive, and appears paranoid." However, he did not exhibit "any dangerous behaviors." He was prescribed Clozaril, Depakote (mood stabilizer), and Thiothixene (anti-psychotic medication). Dr. Formica diagnosed Mr. N.D. with Schizophrenia; all subsequent clinicians diagnosed him with Schizoaffective Disorder. (page 6-page7)
In 2017, Dr. Nena Irinco noted that Mr. N.D. remained compliant with his medication regimen. In 01/2017, he was reportedly admitted to Nyack Hospital with an infectious colitis. His clozapine was held for four days and then restarted. Shortly after he was discharged from the hospital, he reportedly consumed a large amount of food at the cafe and "for medical safety reasons of engorging himself on foods after his colitis episode, he had to be escorted to the RC program briefly." Further, his weekend furloughs were restricted in length in an attempt to "limit his time for impulsive maladaptive behavior." He remained "preoccupied with smoking and this addiction results in judgment lapses like borrowing money and giving in to peer pressure by doing things for them in exchange for money." During his 2017 HFC meeting, he reportedly denied having knowledge on the matter, but was able to describe several facets in his relapse prevention plan, including his symptoms and means of managing frustration or other stressors. (Page 8)
In 2022, Dr. Faiz Cheema observed that Mr. N.D. exhibited difficulty understanding how nicotine dependence was a risk factor for fire setting. Further, his unescorted privileges were reportedly paused in 09/2022 after he was found to be smoking. Dr. Cheema wrote that Mr. N.D. refused to comply with discharge planning, refused to go on visits and to residences, and expressed that he did not want to be discharged. Similarly, the HFC [*10](2022) noted that he vacillated in of his motivation for change and discharge. (Page 8)
Mr. N.D. reportedly appeared hesitant to discuss his instant offense and relevant history, often requesting to change the subject (01/25/2024). He exhibited poor understanding of his risk factors and impulsivity that led to his instant offense (02/14/2024; 03/13/2024). His individual therapist attempted to work with him on improving his insight into and ability to cope with his risk factors; however, Mr. N.D. reportedly appeared resistant (02/23/2024;05/01/2024). According to his therapist, he was concrete and stated simply that he would not smoke (05/01/2024; 07/23/2024; 08/19/2024). He denied experiencing any urges to smoke cigarettes (11/18/2024). When prompted to identify the skills that he would use to avoid smoking in the community, he reportedly changed the subject (08/19/2024). He evidently did not retain information as to the negative effects of smoking on his health, medications levels, or risk of starting a fire (09/16/2024). More recently, he declined sessions with the psychologist (01/17/2025), appeared distracted and attempted to change the topic, seemingly resistant to discussing risk factors and coping skills (02/18/2025; 03/14/2025). (Page 9)
Treatment records indicate that Mr. N.D. is generally calm on the unit and refrains from engaging in any altercations with patients or staff (06/26/2024). However, on 08/07/2024, the program manager from the Recovery Center relayed information from another resident, alleging that Mr. N.D. was rude and used racial slurs in the van and engaged in "horseplay" with a peer. On 10/04/2024, he reportedly asked the social work intern for a kiss on the cheeks. During the current evaluation, he denied that he asked the staff member for a kiss and, instead, reported that he asked for "Decasey," a specific staff member. In 01/2025, he was reportedly accused of taking a peer's Quran and, when questioned about the allegation, insisted that it was his and threatened to get the team fired (01/14/2025). He also yelled at a peer, accusing him of "breaking and entering" into his room (01/17/2025). On 03/25/2025, he was observed yelling at a peer who was teasing him. (Page 9)
Dr. Hegg denied that Mr. N.D. exhibits any symptoms of psychosis. However, she reported that his mood appears elevated at times; he reportedly becomes "very verbal, intrusive, agitation, irritable..." She identified his history of smoking cigarettes as indicative of poor impulse control. She denied that he appeared to pose an elevated risk of starting a fire. She also denied that he poses a risk of physical aggression. She noted, "it's just verbal. If a peer yells back, he screams for staff." However, she indicated that he "incites conflict, could be hurt by others, taken advantage of especially with memory, confusion." She opined that his apparent refusal to discuss means of abstaining from cigarettes in the future could reflect both concrete thinking ("definitely very concrete, cognitively at level- cigarettes are not in front of me, not smoking") and deliberate avoidance of discussion. She reported that Mr. N.D.'s escorted furloughs were restricted due to instances in which he exhibited poor impulse control (e.g., eating large amounts of food) and limited mobility. She recalled that his religious supports previously requested that he not be permitted passes to visit them as he "begged for money, overeating, trying to smoke." However, he recently spent four hours with his supports over Easter and the visit "seemed to go well." She noted that his treatment team is discussing the possibility of applying for unescorted furloughs. However, in Dr. Hegg's opinion, Mr. N.D. continues to display problems managing his impulses and frustration. (Page 10)
The evaluator also interviewed Ms. Samantha Marks (Mr. N.D.'s social worker). She recalled that Mr. N.D. lost his unescorted furloughs in the past because he got "in trouble almost daily; lose money, give [money] for cigarettes, beg for more money, they wanted to fight him, he ate so much [he required] hospitalization], ran after a couple of people for cigarettes and fell, miss groups to smoke, friends at church said they couldn't control him." She reported that he appears to do "okay" with escorted furloughs. She denied that he exhibits any interest in fires or that he has attempted to smoke cigarettes in the recent past. In Ms. Marks' opinion, Mr. N.D. would benefit from continuing to address problems with his impulse control. She identified his historical problems with cigarettes, saving money, and "tantrums" as evidence of problems managing his impulses. She denied that he appears to pose a risk of engaging in physical violence, offering a recent example in which another patient struck him and he did not retaliate. (Page 10)
During the current evaluation, he evidenced some thought disturbance (e.g., perseverative thinking). Overall, a diagnosis of Schizoaffective Disorder, Bipolar type (DSM-5-TR F25.0) appears warranted. He has been compliant with taking prescribed medications for more than 20 years and, for several years, has not exhibited symptoms of psychosis or clear episodes of mood impairment. (Page 12)
Evaluation of Risk of Violence: Mr. N.D.'s risk of future violence was evaluated using the Historical-Clinical-Risk Management 20, Version 3 (HCR-20v3). The HCR-20V3 is a structured professional judgment tool used to evaluate the risk of violence by assessing the presence and relevance to violence risk of 10 historical factors. 5 current clinical factors, and 5 future anticipated risk management factors. Each item is coded using detailed scoring guidelines; a final determination as to an individual's risk of future violence is made by considering the combination of factors present. Overall, it is the current evaluator's opinion that Mr. N.D. presents a Low risk of future violence if released to the community. (Page 13).
The presence of a major mental illness- namely, Schizoaffective Disorder -contributes to his risk of fire setting and broader violence risk. He began exhibiting symptoms of psychosis and mood impairment as a teenager, requiring multiple hospitalizations due to presenting as "unmanageable;" setting fires: exhibiting bizarre behaviors, restlessness, and reporting hallucinations and other psychotic symptoms; suicidal ideation and suspected suicide attempt. At the time of the instant offense, he reportedly experienced grandiose and religious-based delusions, auditory hallucinations, and disorganized thinking. He required restraints in the context of experiencing psychiatric symptoms early in his admission to a psychiatric hospital following his detention. However, there is no indication from reviewed records that Mr. N.D. engaged in any acts of violence during a period of time in which he was non-compliant with medications and required a treatment over objection (in 2002), decompensated and suffered from symptoms of psychosis following the death of his mother (in 2007), was without medications for a few days during an admission to the hospital with medical problems (in 2017), or when he exhibited religious preoccupation and disorganized thinking following a diagnosis of COVID-19 in 2020. Mr. N.D. exhibits limited insight into his mental illness, including the symptoms he experienced in the past and the role of mental illness in his instant offense. Nonetheless, he has complied with taking prescribed medications for more than 20 years, and believes that he would experience mood swings and delusional beliefs if he [*11]discontinued medications in the future. If released to a community-based transitional living residence (to which he is open and visited when such visits were permitted), his medications would be monitored. Dr. DeThabrew noted in 2024 that his symptoms appeared well managed with treatment. In the context of his compliance with psychiatric treatment, Mr. N.D. has evidently not exhibited symptoms of psychosis nor has he exhibited episodes of mood impairment in several years. (Page 13 — 14)
Mr. N.D.'s use of cigarettes has been repeatedly highlighted in prior evaluations and treatment records. Indeed, Mr. N.D. recalled that he once set fire as a teenager in an attempt to be placed in a facility in which he would have access to cigarettes and his use of cigarettes has caused him problems with other patients and with adhering to rules (i.e., using cigarettes in violation of conditions of his furloughs). However, with the exception of reportedly chasing a peer in 2020 in an attempt to obtain cigarettes, there is little indication that his cravings or use led to aggression. Further, it bears repeating that there is no indication that he has engaged in any fire-setting behaviors during periods over the past 30 years in which he used cigarettes. Finally, cigarette use amongst individuals with major mental illness is far from uncommon and cigarette use is not an empirically identified risk factor for violence or arson. (Page 14),
There are several factors that are typically associated with an elevated risk of violence that Mr. N.D. does not exhibit (nor has he ever exhibited). Specifically, he has a very limited history of non-violent criminal conduct, indicating a general willingness to comply with the law. He displays very few traits of psychopathy and does not have a known history of substance abuse problems. The absence of high psychopathic traits and problems with drugs or alcohol is of relevance as these conditions can increase one's impulsivity, impair judgment, and - in the ease of substance use - exacerbate symptoms of mental illness. There is no indication that he experiences violent ideation or justifies violence. (Pages 14-15)
Summary: In the evaluator's opinion. Mr. N.D.'s risk of engaging in acts of violence is Low if he is released from inpatient hospitalization. He committed the instant offense (arson in 1991) more than 30 years ago and has spent the entirety of the intervening time within institutional settings. He has very few incidents of physical aggression since 1991 and none resulted in harm to others. He has a chronic psychotic illness and exhibits neurocognitive impairments. Not unusual amongst patients with either condition, he displays limited insight into his mental illness and role of mental illness in his instant offense. However, he has consistently complied with taking prescribed psychotropic medications for more than 20 years and appears to believe that he benefits from them. He does not have a history of violent ideation, high psychopathic traits, extensive criminal history, or substance abuse problems which, if present, could increase his violence risk.
Records and his clinicians indicate that he exhibits impulsive behavior, evidenced in part by irritability and intrusiveness. Although such conduct has led him to use profanity and to become verbally aggressive, there is no indication in several years that he was moving towards acts of physical aggression. Further, while his conduct may increase his risk of victimization, he has not sustained injuries and, in most instances, individuals have not reacted towards him with aggression. He displays poor insight into the potentially deleterious effects of smoking cigarettes and, in the past, overate. Records repeatedly note that his clinicians have not perceived that he posed a significant risk of future fire [*12]setting even when he smoked cigarettes, as he has had access to lighters and other potential materials to set fires and not done so. Further, there is no indication that he struggles with urges to set fire, or displays interest in matches, fires, or burning materials.
Mr. N.D. expressed plans to reside in a community-based residence for individuals with mental illness and access to clinicians. It may be difficult to identify a community residence, given his history of arson. Nonetheless, it is the evaluators opinion given his low risk of violence and arson - that such a placement is appropriate. He also reported his intention to participate in community treatment and to take prescribed medications. In the evaluator's opinion, a residence staffed by clinicians would serve to help Mr. N.D. manage his mental illness, monitor for the emergence of psychiatric symptoms, and provide him with support. In the evaluator's opinion, Mr. N.D. does not suffer for a mental illness for which he requires inpatient treatment nor does he exhibit such impairment in his judgment that he is unable to understand the need for mental health treatment. His low risk of future violence can be managed within a community-based setting. (Page 15)
DIRECT EXAMINATION OF DR. GREEN
Dr Green's direct examination testimony included the following:
Excerpt 1
Q When you discussed Mr. N.D.'s behavior with members of his treatment team, what did they indicate about whether or not he has acted dangerously at Rockland Psychiatric Center?
A They indicated that he does not present himself as physically aggressive, and both of the clinicians that I spoke with did not indicate that he posed a risk of physical aggression. Rather there are times in which he becomes verbally aggressive, but this has not led to any physical altercations, and, in fact, one clinician noted that if a patient starts to yell back that he calls for staff intervention.
Excerpt 2
Q When was the last time that he was physically assaultive? A Records indicate in 2018 that he had thrown a pen at a staff member. In, I believe, it's 2020 he was reported to have chased someone in an attempt to get a cigarette, but there were no records that he had made threats or had attempted physical contact with that individual.
Q Given his instant offense of the arson how concerned are you that he chased somebody that is holding a cigarette?
A He has had access to cigarettes on multiple occasions over the years.
Q Let's just stop there. How do you know that?
A Because he has had unescorted furloughs off and on since 2014. Those were discontinued in 2020, but he has also had escorted furloughs. The reason for his furloughs being restricted at various points is because he has smoked cigarettes. On one instance he had brought cigarettes back to the hospital. This is going back several years, but I am trying to summarize what is known from the records, and, you know, despite all those records of either using or attempting to obtain cigarettes, there's not an indication that he's become physically aggressive, aside from that note that I indicated about [*13]chasing someone.
Excerpt 3
Q From your review of all of his records has he ever acted violently while in the community or tried to set fires or threatened to set fires? A No.
Q What significance does that have in your risk assessment?
A Certainly has great significance. I am assessing what is the risk that he poses to himself and to the community, particularly if he was to be transferred to a community-based setting, and so the fact that there are not allegations that he has become violent in the community indicates that it's not merely the presence of the structured setting of a hospital that has restrained his conduct, but rather that he is not someone who displays a propensity towards violence. He's never indicated violent ideation, for example. With regards to the risk of arson, of course that is something to consider given his instant offense and given reports that he had set two small fires as a teenager, and, you know, thinking about placement and obstacles to placement it is notable that, although he's had access to cigarettes and matches, there's no indication of attempts to set fire. There's no indication about thoughts of fire since the instant offense in 1991.
Q Had his furloughs ever been restricted or limited?
A Yes.
Q Why?
A For smoking cigarettes or for begging other people for money or cigarettes, for overeating, for not — at one point, not fully accounting for how he was spending his unescorted time. I believe those are the primary reasons.
Q And do you believe that those reasons show that he will have a tendency to hurt somebody —
A No.
Q — if conditionally released?
A No. That's never been a reason for his furloughs to be restricted.
Q You state on Page 15 of your report that clinicians have not perceived that Mr. N.D. poses a significant risk of future fire setting, even when he smokes cigarettes. Can you elaborate on which clinicians you are referring to and what was said?
A So this is cited in various hospital forensic committee reports as well as what was reported by both his psychologist and social worker.
Q Is his use of cigarettes of concern to you in terms of risk assessment?
A There is no empirical support about cigarette smoking being a risk factor for violence or for arson setting. Cigarette use, nicotine dependence certainly is far from uncommon amongst individuals with major mental illness.
Q Rockland Psychiatric Center's application refers to Mr. N.D.'s rule-breaking behavior. Did you notice any rule-breaking behavior in the record, and was it of concern to you in regards to possible future violence?
A That appears to be referencing the conduct that I described that resulted in restrictions to his furloughs.
Q Which risk assessments did you administer to Mr. N.D., if any?
A The HCR-20, Version 3. That's the Historical Clinical Risk Management, Version 3.
Q And what does that measure?
A It assesses or it's used to guide assessment of an individual's violence risk by evaluating for the presence of empirically supported factors related to violence risk, including historical factors, current clinical factors and anticipated risk management factors?
Q Who, if anyone, trained you to conduct and interpret the test?
A Authors of the HCR-20, including Dr. Steven Hart and Dr. Kevin Douglas.
Q And isn't HCR-20 commonly used by psychologists to assess forensic patients?
A It is, and it's been used in New York State in CPL 330 evaluations for years.
Q To a reasonable degree of psychological certainty what level of risk of future violence would Mr. N.D. present in the community if conditionally released?
A Low.
Q And why do you say that?
A He presents with few risk factors for violence. Most importantly is the presence of a major mental illness. He does indicate some problems of insight into his mental illness and into dangerousness. He historically has had issues of compliance with his medications, including at the time of the instant offense. However, in my opinion there are several risk factors that are not present and risk factors that he has mitigated. So, in terms of his major mental illness he continues at times to present with some of the symptoms that we discussed, but it has been several years since he's exhibited acute psychotic symptoms or mood episodes. Although he has a history of non-compliance with medications, he has been compliant for over 20 years. There's no indication that he would stop taking medications. That's a question I pose to everyone that I interviewed with, whether he's ever voiced such an intention. He has a history of violence. Fire setting is included among the definition of violence in HCR-20. There were instances where as a teenager where he was aggressive towards individuals, and in the early '90s instances of aggression as well as the incident in 2018 of throwing a pen, but he has not been since 2018 described as engaging in any acts of violence. So, those are factors that have been mitigated to some extent. He presents with very few traits of psychopathy. That's akin to antisocial personality disorder, but it also includes interpersonal deficits, impulsivity, lifestyle factors, and he presents with very few traits, including, in comparison to other male forensic patients, he does not have a known history of alcohol or substantive drug use problems. Either psychopathy of drug use can increase impulsivity. He does not have a criminal history outside of the instant offense, including for non-violent offenses, but he does have some social support. His plans for the future are realistic and in line with what is typical of individuals who progress through the system of CPL 330. He is agreeable to going to a supervised community setting to continuing with psychiatric treatment. When I ask about vocational interests, again, very reasonable. He talks about participating in long care.
Q You mentioned that he had a few incidents of fire setting, and I believe those are between 1984 and 1991. Are you concerned — withdrawn. Why do you believe that he is at low risk of fire setting in the future if he had those few incidents back then?
A So, in my opinion his risk of committing a violent act defined as physical aggression towards one is low, and his risk of arson is only slightly higher than that. So it might be slightly higher than low risk. In other words, those incidents that pre-dated the instant [*14]offense occurred when he was a teenager, so it is going back close to 40 years at this point, and he has not displayed any fascination with fire, attempts to set fire, accumulation of materials in his room that can be used to set fire.
Q In your review of records were there any notes where he demonstrated an urge to set fires?
A No.
Q Did you administer the Minnesota Multiphasic Personality Inventory assessment to Mr. N.D.?
A I did.
Q What does that measure?
A It measures one response style so the extent to which an individual presents itself in a genuine matter without exaggeration or minimization. It also assesses for personality traits and for current symptoms of mental illness.
Q Who, if anyone, trained you to conduct and interpret that test?
A I was trained by Dr. Benau (ph).
Q Is it commonly used by psychologists to assess forensic patients?
A Yes.
Q What did you learn about Mr. N.D. from that assessment?
A So he responded consistently. He did respond in a way that suggests under recording that can reflect both limited insight, which I think is apparent in his case, as well as some traditional values, despite, and I apologize, in line with that minimization there was also no indication of major mood impairment or psychotic symptoms or anxiety symptoms. Rather he presented himself as fairly well adjusted. That said, he complained about or he endorsed symptoms that are in line with his complaints and observations of cognitive impairments. Problems with memory, concentration, frustration.
Q To a reasonable degree of psychological certainty does Mr. N.D.'s mental illness require inpatient care?
A In my opinion, no.
Q And why not?
A He has evidenced a willingness to comply with treatment for over 20 years, psychiatric, as well as meeting with the psychologist, the social worker, in groups. He does not evidence a risk of violence. His risk of arson, so specific to his instant offense, appears to be managed. The irritability that he exhibits certainly is not atypical and can be managed outside of a hospital setting. He shows the capacity to form rapport with treatment providers. He has not exhibited elopement behaviors, substance use behaviors. Factors that might be more of concern in a different setting.
Q What would be the least restrictive but appropriate placement for him?
A In my opinion he would benefit and likely requires a supervised community-based setting.
Q Did he indicate to you how he would feel about living in a supervised setting?
A He was interested in such.
Q Rockland Psychiatric Center's court application indicates that he has limited mobility, and he is a fall risk. Would you agree with that?
A Yes.
Q And why do you believe that inpatient hospitalization is not the least restrictive [*15]alternate, despite his limited mobility and need for assistance with his activities of daily living?
A Some of the limited mobility may relate to his use of medications, but, otherwise, they are not psychiatric symptoms. They are not psychological conditions. Certainly, there are facilities that can manage physical limitations.
DR. GREEN'S CROSS-EXAMINATION
The following are excerpts of Dr Green's cross-examination testimony:
Excerpt 1
Q So the testimony, Doctor, has been that he has not exercised these furloughs without incident, isn't that correct, except with the exception of the most recent one at Easter to his church?
A He has had incidents of smoking cigarettes, of begging for money, of chasing an individual —
Q So sorry to cut you off, but my initial question was that wouldn't it be in the interest — in his interest to be a better candidate for application to a community residence to demonstrate consistency and not engaging in those behaviors on furloughs?
A In my opinion, those behaviors do not indicate an elevated risk of dangerousness to himself or others nor do they indicate the presence of psychiatric illness for which he requires inpatient hospitalization.
Q Do they indicate to you an inability to follow the rules?
A They indicate some difficulty with rules. I don't think it's an inability to follow rules, and that is clearly demonstrated in his most recent furlough in which he was out of the hospital for several hours and complied with rule. He's also complied with rules for escorted furloughs to the recovery center multiple times a week.
Q And with the escorted furloughs, he's escorted by staff and he's in a group of other individuals; is that correct?
A Yes.
Q And do you agree that danger to one's self can arise from being verbally aggressive, verbally aggressive behavior which can result in victimization of the defendant?
A It could.
Q Did you take into account that smoking can affect the efficacy of his medication for his mental health, mental illness?
A That's obviously outside of my area of expertise. He has not, to my knowledge, required increased dosages of medications during times in which he has been smoking —
Excerpt 2
Q Doctor, you're aware that Mr. N.D. committed three acts of intentional fire-setting between 1984 and 1991; is that correct?
A Yes.
Q And he's been hospitalized, essentially, since 1991, correct?
A Yes.
Q So he's been living in a supervised setting since 1991, correct?
A Yes.
Q And I believe you testified that past evidence of violence is a risk factor for future [*16]dangerousness or violence?
A Yes.
Q So the fact that he's been not living in the community for over 30 years, he hasn't had an opportunity to live independently and have an opportunity to set fires; is that correct?
A He's not had an opportunity to live independently. There has been opportunity for fire-setting. In fact, several years ago one of the reasons his furloughs were restricted is that he had brought back a lighter and cigarettes; no indication of fire-setting conduct. There have been incidents where he has been smoking outside of the hospital while on furloughs; no evidence of an attempt to set fire. According to the social worker there was contraband on the unit more recently for which he was not involved but, again, it involved fire-setting materials, so there have been opportunities, clearly less so than if he was in independent housing, but no indication of fire-setting behavior.
Q But if he was living independently without supervision as he would be under — if he was discharged to the community —
MS. FORTE: Objection, just to that characterization that he would not have supervision in the community, as that's inaccurate; he would live in a supervised residence.
THE COURT: Well, I need the question fully asked before I can respond to the objection.
MS. FORTE: Sorry, Your Honor.
THE COURT: That's okay. Let me hear the question, and then I will certainly entertain the objection.
Q If Mr. N.D. is discharged to a community residence, he would not have the same supervision he would have at Rockland; is that correct?
A Yes.
RE-DIRECT EXAMINATION OF DR. GREEN
Dr Green testified on re-direct examination, in part, as follows:
Q Moving along to his transition to the community. What type of transitional steps has he already undergone as a transition to the community, if any?
A He has had furloughs now for over a decade, unescorted and escorted. He did attend Highview, which is a supervised community-based residence. He attended there for dinners. It is my understanding that he's not had the opportunity since the COVID-19 pandemic. He has also worked with his social worker on discharge planning, that's reflected in the treatment records, and he attends the recovery center multiple times a week, which is on the grounds of the hospital but outside of the hospital — of the facility in which he resides.
Q Would you say that a conditional release with a stay would provide further transition to the community?
A I apologize. I might need it without the legal language.
Q No problem. If Judge Cornell denied this retention application but he allowed the hospital to keep Mr. N.D. until placement was secured, would you consider that interim period of time a further period of time for transition?
A Yes. And that would allow for Mr. N.D. to connect with the facility and for the hospital to identify an appropriate approved placement.
Q And should Judge Cornell deny this retention application, do you have any [*17]recommendation of the amount of interim time that would be sufficient?
A I don't, because it's my opinion that he does not currently meet the criteria for need for inpatient hospitalization.
Q And regarding his compliance with the rules, how likely is it that Mr. N.D. would follow the provisions of an order of conditions?
A The —
Q Do you understand the —
A Yes, I do.
Q — provisions part?
A Yes, I do. The conditions that I think would be most important, including complying with placement and residence approval, there's no indication of elopement risk. In terms of complying with treatment, he has demonstrated willingness to take psychotropic medications now for over 20 years. In terms of participating in psychological interventions, for example, through day treatment, he has exhibited compliance with attending treatment groups multiple times a week.
In terms of maintaining abstinence from drugs or alcohol, that has not evidently been an issue since the instant offense, but for his disclosure four years ago of taking a puff of marijuana. So there are no records indicating drug or alcohol use. In terms of not engaging in acts of violence, there's no indication of any acts of physical aggression since he threw a pen in 2018. He may struggle with rules of the facility or the residence in which he is placed, but those factors that are most directly related to managing his mental illness and mitigating his risk of violence, in my opinion, he is likely to adhere to.
Q When he threw that pen was anybody hurt?
A Records do not indicate that they were.
Q And did he follow with another action of hitting anybody or threatening to hit anybody?
A No.
Q My last question is regarding opposing counsel's concern that smoking might alter Clozapine levels. Would you recommend blood monitoring of his medication blood levels in the outpatient order of conditions?
A Certainly.
Q Would you recommend that he continue seeing a psychiatrist who can review the blood levels?
A Certainly.
POSITIONS OF THE PARTIES
RPC argues that it has met its burden of proof by a preponderance of the evidence that Respondent continues to require in-patient care due to his long-standing mental health status and because he continues to pose a danger to himself or others, due primarily to his perseverative interest in cigarettes and the risk of fire setting if he were not retained in the supervised setting of an in-patient facility. RPC also argues that Respondent has not demonstrated a sufficient level of insight into his mental health and may not follow-through with adhering to his prescribed medication regimen unless he is highly supervised. RPC takes the position that unless and until Respondent successfully completes a program of unsupervised furloughs without incident, he is not yet ready for even a conditional release from the in-patient setting.
On the other hand, Respondent argues that RPC has not met its burden of proof by showing by a preponderance of the evidence that the Respondent is, in fact, a continuing danger to himself or others, as required for a further CPL 330.20 retention. Respondent argues that he has been under the care and supervision of the Commissioner of Mental Health for over 33 years, that the criminal offense which lead to his commitment was when he was a young man, that the evidence RPC relies upon to show that he has exhibited violent or dangerous behaviors does not rise to a level which can be found to constitute the requite "dangerousness" which RPC must show and that Respondent poses a low risk of danger to himself or others.
DISCUSSION
This case directly implicates the analysis of the retention procedure of CPL 330.20 undertaken by the Court of Appeals in In the Matter of David B., 97 NY2d 267, (2002). In the David B case, the Court of Appeals examined two appeals from CPL 330.20 retention grants.
The Court of Appeals distilled the issue presented as follows:
Appellants argue that continued retention based solely upon a finding of "mental illness" without a concomitant finding of dangerousness violates their rights to substantive due process of law. Both mental illness and dangerousness are necessary elements of any commitment or retention of an insanity acquittee (see Jones v. United States, 463 U.S. 354, 103 S.Ct. 3043, 77 L.Ed.2d 694 [1983] ). Neither a showing of mental illness alone, nor dangerousness alone, will satisfy the requirements of due process when an individual's right to liberty is at stake (see Foucha, 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437). Indeed, all parties now agree that there is a constitutionally required minimum level of dangerousness to oneself or others that must be shown before an insanity acquittee may be retained in a non-secure facility, and that a finding that an individual is "mentally ill" as defined under CPL 330.20(1)(d) contemplates a degree of dangerousness that satisfies due process concerns. In these appeals, we must determine what the required level of dangerousness is and whether the courts below applied that standard in these cases.
The Court explained that:
"Mentally ill" under CPL 330.20(1)(d) has three distinguishing characteristics: (1) the illness is of a kind that requires inpatient care and treatment, (2) care and treatment of the illness are essential to the defendant's welfare, and (3) because of impaired judgment the defendant does not understand the need for such care and treatment. Although the word "dangerous" does not appear in the statute, the constitutionally required element of dangerousness to oneself or others is subsumed in the language of the provision.5
In the Court's footnote 5, it wrote:
We do not believe, as the Appellate Division decisions in both cases suggest, that a finding of mental illness pursuant to CPL 330.20(1)(c)(i) is sufficient to justify commitment to a non-secure facility. That clause, which refers to the definition of mental illness found in Mental Hygiene Law § 1.03(20), is but one prong of the two-prong "dangerous mental disorder" test in CPL 330.20(1)(c). Mental Hygiene Law § 1.03(20) merely defines "mental illness" without considering factors relating to dangerousness to self or others that would satisfy due process concerns before commitment can take place.
The question here is whether there has been sufficient proof - proof by a preponderance of the evidence - of Respondent's dangerousness. The David B. Court articulated that the requirement of a "dangerousness" showing is an essential component of a CPL 330.20 retention. The Court also explained that while "a finding of dangerousness may be supported by evidence of violence, dangerousness is not coterminous with violence."
The requisite "dangerousness" showing is not dependent upon a showing of a risk of violence. "Dangerousness" is not that which might be generally understood as meaning a risk of injury, harm or pain. Merriam-Webster defines the adjective form of dangerousness, "dangerous" as (1) "involving possible injury, pain, or loss: characterized by danger" or (2) "able or likely to inflict injury or harm".
The David B. Court articulates a more nuanced meaning as applied in the CPL 330.20 retention cases. In pertinent part, the Court held:
Apart from evidence of violence, retention of an insanity acquittee in a non-secure facility is justified where the State shows by a preponderance of the evidence that continued care and treatment are essential to the physical or psychological welfare of the individual and that the individual is unable to understand the need for such care and treatment. Retention also may be supported by the need to prepare for a safe and stable transition from non-secure commitment to release. Thus, in addition to recent acts of violence and the risk of harm to the defendant or others that would be occasioned by release from confinement, a court may consider the nature of the conduct that resulted in the initial commitment, the likelihood of relapse or a cure, history of substance or alcohol abuse, the effects of medication, the likelihood that the patient will discontinue medication without supervision, the length of confinement and treatment, the lapse of time since the underlying criminal acts and any other relevant factors that form a part of an insanity acquittee's psychological profile . . .
Thus, the Court of Appeals has established the framework for examining these applications by listing thirteen (13) non-exclusive criteria:
1) that continued care and treatment are essential to the physical or psychological welfare of the individual;
2) that the individual is unable to understand the need for such care and treatment;
3) that retention also may be supported by the need to prepare for a safe and stable transition from non-secure commitment to release;
4) evidence of recent acts of violence;
5) the risk of harm to the defendant or others that would be occasioned by release from confinement;
6) the nature of the conduct that resulted in the initial commitment;
7) the likelihood of relapse or a cure;
8) history of substance or alcohol abuse;
9) the effects of medication;
10) the likelihood that the patient will discontinue medication without supervision;
11) the length of confinement and treatment;
12) the lapse of time since the underlying criminal acts;
13) and any other relevant factors that form a part of an insanity acquittee's psychological profile.
This Court analyzes these criteria as follows:
1) Whether continued in-patient care is essential?
There is no dispute that Respondent requires continuing care and supervision. He has an almost life-long history of mental health issues reaching back into his early teen years. RPC seeks a two-year rendition extension. The HFC Report specifically refers to the need for more time for the purpose of safely transitioning to the community. The parties' positions diverge on whether continued in-patient treatment is necessary. Respondent argues that RPC as been slow to facilitate unescorted furloughs and has not diligently explored alternatives for Respondent's placement in the community. According to the Green Report (as reported by Respondent's social worker), Respondent had unescorted furloughs suspended in the past because of various behaviors, such as losing money, begging for money, overeating to the point of needing a hospitalization, begging for cigarettes. Clearly, these behaviors are anti-social, but Green opines that Respondent is not in need of in-patient care and could be managed in a community housing setting with appropriate supervision.
2) Whether Respondent understands his need for care?
Both RPC and Green indicate that Respondent does, indeed, recognize his need for care and that he has been compliant with medications. RPC indicates that he does engage with his treatment and some group sessions, albeit with somewhat limited participation. Green reports that Respondent expressed to her that he wished to live in the community and that he would cooperate with community treatment and medication.
3) Whether retention is needed to prepare for safe transition?
RPC take the position that he requires continued in-patient care. Green opines that he can be adequately cared for and supported in the community and no longer requires in-patient care. RPC argues that more experience with unescorted furloughs is needed.
4) What is evidence of recent violence?
There is no evidence of recent violent behavior. Approximately seven (7) years ago Respondent threw a pen at a staff member. No other incidents of significance are germane.
5) What is the level of risk of harm to Respondent or others if released?
The evidence shows a low risk of harm to Respondent or others if released. Respondent currently uses a walker to aid his mobility. RPC suggests that Respondent may be at risk if he were to beg for cigarettes or behave in a rude manner which could result in him being victimized in some manner. RPC also suggests that due to his perseverative interest in cigarettes he could be at risk of fire-starting. Since the underlying arrest for arson over 30 years ago, Respondent has not attempted to start fires and has not evinced any behaviors indicating that this remains a risk. Green opines that "there is no indication that he struggles with urges to set fire, or displays interest in matches, fires, or burning materials." Green also indicates that , based upon her review of clinical records, clinicians have not perceived a significant risk of Respondent attempting fire setting, even if he had access to cigarettes or fire starting materials.
6) What is nature of conduct resulting in original commitment?
The original commitment emanated from Respondent's act of setting a building fire at the age of 23.
7) What is the likelihood of relapse or cure?
Evidence strongly suggests that Respondent will not be cured of his condition. [*18]Respondent appears to have been stable for a significant period. Indications are that with continued medication and support he should continue to maintain his status quo. The risk of relapse appears low, provided care and medication protocols are in place.
8) What is Respondent's history of substance or alcohol abuse?
There is no reported history of alcohol or substance abuse, except for an indication that he reported having been intoxicated the night before the underlying offense on 8/7/1991.
9) What are the effects of Respondent's medication?
Respondent's medication regimen appears important for sustaining him. According to Dr. DeThabrew's 9/10/24 Retention Application, his regimen of "clozapine, Depakote and Fluoxetine has been effective in controlling his psychiatric symptoms".
10) What is the likelihood that Respondent will discontinue medication without supervision?
There is a significant history of Respondent being compliant with medication and he has reported that he believes he feels better with the medication. There is also reporting that he has indicated a willingness to continue to adhere to a course of medications as prescribed. With supervision, the risk of non-compliance is minimal. It is anticipated that Respondent would be adequately supervised so as to monitor his medication compliance.
11) What has been the length of Respondent's commitment?
Respondent has been committed for 33 years.
12) How much time elapsed from the underlying criminal acts?
It has been 33 years since the occurrence of the underlying criminal acts.
13) What other relevant factors are part or Respondent's psychological profile?
None.
The Court has considered the petition in light of this analysis.
RPC must show by a preponderance of the evidence that Respondent is either 1) mentally ill or 2) has a dangerous mental disorder which warrants his further in-patient retention pursuant to CPL 330.20. The preponderance of the evidence standard is a comparatively low standard of proof. It is often referred to as the "more likely than not" standard (i.e. greater than 50%) and Courts recognize that if the evidence tips the scales even only slightly in favor of the party who has the burden of proof, then the burden is met.
CPL 330.20(1)(c) provides that a "dangerous mental disorder" means: "(i) that a defendant currently suffers from a 'mental illness' as that term is defined in subdivision twenty of section 1.03 of the mental hygiene law, and (ii) that because of such condition he currently constitutes a physical danger to himself or others."
CPL 330.20(1)(d) provides that "mentally ill" means:
"that a defendant currently suffers from a mental illness for which care and treatment as a patient, in the in-patient services of a psychiatric center under the jurisdiction of the state office of mental health, is essential to such defendant's welfare and that his or her judgment is so impaired that he is unable to understand the need for such care and treatment; and, where a defendant has a developmental disability, the term "mentally ill" shall also mean, for purposes of this section, that the defendant is in need of care and treatment as a resident in the in-patient services of a developmental center or other residential facility for individuals with developmental disabilities under the jurisdiction of the state office for people with developmental disabilities."
Thus, "mental illness", as defined by the statute is the sine qua non of this analysis.
The Court's task is not to determine what the best course of treatment for the Respondent is or what is in his best interest, but only whether RPC has shown that Respondent must be retained pursuant to the dictates of CPL 330.20.
Despite the seriousness of the instant offense of arson, that occurrence was over 30 years ago. RPC takes the position that Respondent's perseverative behavior around cigarettes as well as other behaviors and mental health status inexorably leads to the conclusion that he should remain in in-patient retention. This Court is not persuaded. The Court is not convinced that Respondent continues to meet the statutory criteria for "mentally ill."
Nor is it persuaded that Respondent, due to some history of rude behavior, poses a risk of causing a disturbance which will lead to him being victimized, or to him being a community risk sufficient to warrant retention. RPC has argued that because of his compulsion to seek cigarettes, some history of speaking in an aggressive manner and behaving in antisocial ways, he poses a risk to himself or others. RPC is correct to raise these concerns as risk factors. Certainly, there is some risk that outside of the in-patient setting, Respondent will be more likely to experience challenging situations than when living in the more structured institutional setting, but there is a paucity of evidence that tips the scales in favor of retention.
Respondent's history of fire starting is decades old, he has been largely compliant with his regimen of prescribed medicines, there is negligible recent history of violent behavior, save for him throwing a pen at a staff member in 2018, he recognizes the need for his care and has expressed a willingness to comply with the continuation of his medications.
RPC argues that there is insufficient history of Respondent successfully completing unescorted furloughs. RPC believes that more time is needed to transition Respondent into the community after a period of successful unescorted furloughs. The lack of a sufficient history of these furloughs, however, has resulted in a self-fulfilling prophecy. While more experience with successful unescorted furloughs could well facilitate a transition to the community, the lack of these furloughs is not evidence of Respondent's dangerousness or need for in-patient care.
While the reasons for RPC having curtailed these furloughs may have had merit, those reasons, including Respondent begging for money and/or cigarettes, can hardly be considered behaviors which should be considered dangerous in of themselves, so RPC cannot equate its determination to curtail those furloughs with Respondent being a danger or requiring in-patient retention. What may be considered antisocial behaviors or challenges with rule following is simply not enough to conclude that Respondent requires retention. On the contrary, RPC should have developed a more robust program of facilitating furloughs for Respondent.
Monitoring the Respondent and finding ways of assisting him and helping him remain safe and healthy may present a significant challenge. But, a fair reading of all the history, including RPC's own records and the independent evaluation of Dr. Green shows that it is now time to transition the Respondent into a community setting.
The Court is persuaded by the testimony of Dr. Green that Respondent neither poses a danger to himself or others nor continues to require in-patient treatment. Based upon the foregoing, the Court finds that despite Respondent's on-going need for mental health care and support, he does not present with a dangerous mental disorder as defined by CPL 330.20 and he is not "mentally ill" as defined by CPL 330.20. 
Based upon the foregoing, it is
ORDERED, that petitioner's application for a further retention order pursuant to CPL [*19]330.20 is hereby DENIED; and it is further
ORDERED, that Respondent's request for a release order is granted with a ninety (90) day stay; and it is further
ORDERED, that RPC shall, within thirty (30) days of the date hereof, submit a proposed service plan in accordance with CPL 330.20 (12) for the Court's review and approval; and it is further
ORDERED, that the parties shall, within thirty (30) days of the date hereof, each submit a proposed discharge order and order of conditions or, alternatively, a proposed discharge order and order of conditions on consent for the Court's review and approval. 
THE FOREGOING SHALL BE THE DECISION AND ORDER OF THE COURT.
Dated: August 12, 2025
New City, New York
E N T E R:
HON. KEITH J. CORNELL A.J.S.C.